IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

L.I. CITY.VENTURES, d/b/a/
MODERN SPACES,

                Plaintiff,

v.

URBAN COMPASS, INC. d/b/a/
COMPASS and JESSICA MEIS,

                Defendants.

Case No. 18-cv-5853-PGG

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

KIRSCH & NIEHAUS PLLC
Emily B. Kirsch
150 E. 58th Street, 22nd Floor
New York, NY 10155
(212) 832-0170
Emily.Kirsch@kirschniehaus.com

Dated: August 17, 2018
       New York, New York

# TABLE OF CONTENTS

PRELIMINARY STATEMENT................................................................................................1

FACTS..........................................................................................................................................3

   I.    The Parties.......................................................................................................................3

   II.   Jessica Meis Develops her Career as a Real Estate
        Agent in her Home Community of Queens........................................................4

   III.  The Information at Issue...............................................................................................6

   IV.  Procedural History ........................................................................................................8

ARGUMENT ............................................................................................................................10

   I.    The Preliminary Injunction Should Be Denied Because
       There Is No Showing of Any Threat of Irreparable Harm ...................................10

      A.   The Five-Month Delay in Moving for Emergency Relief Is Unreasonable ...11

      B.   The Plaintiff Has Not Met Its Burden of Demonstrating
           Evidence of Actual or Imminent Irreparable Harm ........................................12

   II.   The Preliminary Injunction Should Be Denied Because Plaintiff Is Not Likely
       Succeed on The Merits of Either Its DTSA or its Breach of Contract Claim .......16

      A.   Plaintiff is Unlikely to Succeed on the Merits of Its Defend
           Trade Secrets Act Because No Information at Issue Can
           be Considered a Trade Secret of Modern Spaces. ...........................................16

      B.   Plaintiff is Not Likely To Succeed on the Merits
           of Its Breach of Contract Claim..........................................................................20

   III.  The Balance of Equities Favors Denial of The Preliminary Injunction ...............21

   IV.  Issuance of a Preliminary Injunction Will Disserve the Public Interest...............22

CONCLUSION.........................................................................................................................23

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Airlines, Inc. v. Imhof,*
    620 F.Supp.2d 574 (S.D.N.Y. 2009) ........................................................10

*Apfel v. Prudential-Bache Sec.,*
    81 N.Y.2d 470 (1993) ........................................................................21

*BDO Seidman v. Hirshberg,*
    93 N.Y.2d 382 (1999) ...................................................................20, 22

*Broker Genius, Inc. v. Zalta,*
    280 F.Supp.3d 495 (S.D.N.Y. 2017) ........................................................17

*Business Trends Analysts v. Freedonia Gorup, Inc.,*
    650 F.Supp. 1452 (S.D.N.Y 1987) ...........................................................11

*Candler Coffee Corp. v. Eigenfeld,*
    432 N.Y.S. 816, *aff'd* 87 A.D.2d 569 (1st Dep't 1982) ...........................19

*Citibank, N.A. v. CityTrust,*
    756 F.2d 273 (2d Cir. 1985) ................................................................11

*Columbia Ribbon & Carbon Mfg. Co., Inc. v. A-1-A Corp.,*
    42 N.Y.2d 496 (1977) .........................................................................20

*In re Document Technologies Litigation,*
    275 F.Supp.3d 454 (S.D.N.Y. 2017) ........................................................18

*Faively Transp. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110, 118 (2d Cir. 2009) .....................................................10, 12

*Fisher Price, Inc. v. Well Made Toy Mfg.,*
    25 F.3d 119 (2d Cir. 1994) ................................................................11

*Free Country, Ltd. v. Drennan,*
    235 F.Supp.3d 559 (S.D.N.Y. 2016) ..................................................16, 17

*Geritrex Corp. v Dermarite Indus., LLC,*
    910 F.Supp. 955 (S.D.N.Y. 1996) ................................................13, 15, 17

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) .................................................................10

*Iron Mountain Information Management, Inc. v. Taddeo,*
    455 F.Supp.2d 124, 139 (S.D.N.Y. 2006). ........................................................19

*JBR, Inc. v. Keurig Green Mountain, Inc.,*
    618 Fed. Appx. 31 (2d Cir 2015)........................................................................10

*Mazurek v Armstrong,*
    520 U.S. 968 (1997) ............................................................................................10

*Misys Intl. Banking Sys., Inc. v. TwoFour Sys., LLC,*
    800 N.Y.S.2d 350 (N.Y.Sup.Ct. 2004) ...............................................................15

*O.P.F Optronics Ltd. V. Remington Arms Co.,*
    No. 08 Civ. 4746, 2008 WL 4410130 (S.D.N.Y. Sept. 26, 2008)........................13

*Overholt Crop Ins. Service Co., v. Travis,*
    941 F.2d 1361 (8th Cir. 1991) ............................................................................15

*Park W. Radiology v. CareCore Nat'l LLC,*
    240 F.R.D 109 (S.D.N.Y. 2007) .........................................................................13

*Passologix, Inc. v. 2FA technology, LLC,*
    No. 08 Civ. 10986 (PKL), 2010 WL 2505628 (S.D.N.Y. June 21, 2010)............13

*Production Resource Group, LLC v. Oberman,*
    No.  03-Civ. 5366, 2003 WL 22350939 (S.D.N.Y. Aug. 27, 2003) ................17, 21

*Reed Roberts Assoc. v. Strauman,*
    40 N.Y.2d 303, 307 (1976) .................................................................................22

*Shmueli v. NRT New York, Inc.,*
    802 N.Y.S.2d 871 (N.Y.Sup.Ct. 2005) ...........................................................18, 20

*Support Sys. Assoc. v. Tavolacci,*
    135 A.D.2d 704 (2d. Dept. 1987)........................................................................15

*Sussman v. Crawford,*
    488 F.3d 136 (2d Cir. 2007) ...............................................................................10

*Ticor Title Ins. Co., v. Cohen,*
    173 F.3d 63 (2d Cir. 1999) .................................................................................14

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
    60 F.3d 27 (2d Cir. 1995)....................................................................................11

iii

*Velo-bind, Inc. v. Scheck,*
   485 F.Supp. 102 (S.D.N.Y. 1979) ......................................................................14, 17

*W.W.W. Assoc. v. Giancontieri,*
   777 N.Y.2d 157 (1990) ........................................................................................21

*Webcraft Techs., Inc. v. McCaw,*
   674 F.Supp.2d 1039 (S.D.N.Y 1987) ..................................................................17

*Willis of New York, Inc. v. DeFelice,*
   299 A.D.2d 240 (1st Dept. 2002) ........................................................................14

**Statutes**

18 U.S.C. §§ 1836 *et seq* ...........................................................................................16

Defendants Urban Compass, Inc. ("Compass") and Jessica Meis, by and through their attorneys, Kirsch & Niehaus, PLLC, respectfully submit this memorandum of law in opposition to the motion for preliminary injunction brought by the plaintiff L.I.C. Ventures, LLC ("Modern Spaces").

## PRELIMINARY STATEMENT

This case and this motion are a transparent attempt by plaintiff to use litigation tactics to stifle lawful competition in the Queens real estate brokerage market from the up-and-coming, highly successful Compass. Jessica Meis, a licensed real estate agent and Queens native, gave her notice to plaintiff Modern Spaces in January that she would be leaving Modern Spaces to affiliate instead with the brokerage firm Compass. As an independent contractor, Meis was free to move and affiliate with whom she pleased, and she found the Compass brand more aligned with her goals. Although a contract governed the independent contractor relationship, it contained no non-competition provision and no prohibition on soliciting Modern Spaces' customers. Plaintiff may not like it, but she was free to go.

Nevertheless, Modern Spaces hoped to dissuade her from moving, and to send a message to Compass and to its own agents that it would make life very difficult for those who sought to leave Modern Spaces.  Modern Spaces searched Meis' email and found that prior to leaving she sent to herself documents containing her own personal contacts, files of closed deals that she was entitled and required to keep under

1

licensing laws, and other notes associated with her own business. Notwithstanding the fct that this information was owned by Meis, Modern Spaces filed a lawsuit in early February alleging that Meis had stolen proprietary its information in violation of her agreement.

Tellingly, at that time, Modern Spaces did not move for any emergency injunctive relief and the complaint did not allege any trade secret misappropriation. Instead, Modern Spaces hoped to "resolve" the matter for money. This was ultimately unsuccessful, so *five months later* it doubled-down on its litigation strategy, amended its complaint and sought this preliminary injunction. To be clear, no new facts had emerged and no circumstances had changed between January and when plaintiff filed this motion in June and renewed in July. Even now the motion rests solely on one self-serving affidavit of its president which itself is comprised of only conclusory statements and no substantiating evidence. Plaintiff fails to meet its burden of a clear showing that is entitled to injunctive relief for at least the following reasons:

- Plaintiff has made no showing of any actual or threatened irreparable harm, let alone harm of any kind that is connected to any actions of the defendants, despite the passage of seven months;

- Plaintiff has made no showing of a likelihood of success on the merits of its underlying claims; it has not shown that any of the information in Meis possession is a trade secret, or even proprietary to Modern Spaces, let alone that any such information was ever used by Meis or ever shared with Compass;

- Even if plaintiff had shown any of the above, the harm to Meis of issuing an injunction is tantamount to precluding her from earning a livelihood and far outweighs the absence of evidence of any harm to plaintiff from denying the injunction; and

2

- The public interest would be disserved by issuing an injunction against Meis using her own information and personal contacts. Such an order would stifle competition and turn an overbroad non-disclosure clause into a non-compete in disguise, effectively tying the independent contractor to her current brokerage affiliate indefinitely.

The motion should be denied in its entirety.

## FACTS

I.     **The Parties**

Defendant Compass launched in New York in 2015 and is indisputably the fastest growing real estate brokerage firm. *August 16, 2018 Declaration of Dennis D. McCarthy at ¶5.* It challenged the real estate brokerage "old guard" by building what it refers to as the first modern real estate platform. *Id.* It pairs top agent talent with cutting edge technology that provides those agents with quick, comprehensive and in-depth access to information that is unparalleled in the industry. *Id.* As a result of having the brightest technology minds developing and constantly improving the proprietary technology platform, the agents have more time to advise their clients and to develop their businesses. *Id.* For these reasons, agents from all the old guard brokerages seek to affiliate with Compass to further develop and grow their businesses. *Id.* Compass currently has 22 agents working out of the Queens office, including Ms. Meis. Compass' sales volume in active listings in Queens is roughly $58 million.

Jessica Meis is a licensed real estate agent who was born and raised in Queens and lived in Long Island City from approximately September 2009 through November 2017. *August 16, 2018 Affidavit of Jessica Meis ("August Meis Aff.") at ¶2.* She

3

has always been very active in the community, including with the local school her son attended and various other activities. *Id.* Over the course of many years, Meis built a substantial network of friends and acquaintances in the Long Island City area. *Id.* From approximately November 2016 through January 2018 she was affiliated with Modern Spaces, an independently owned real estate brokerage firm specializing in residential and commercial sales and leasing in Queens. *June 18, 2018 Affidavit of Jessica Meis ("June Meis Aff.") at ¶3; June 12, 2018 Affidavit of Eric Benaim ("Benaim Aff.") at ¶¶ 3-4.* In January 2018, she terminated her relationship with Modern Spaces to affiliate with Compass which she felt was more in line with her goals and offered her exciting new opportunities to further her career. *June Meis Aff. at ¶4.*

## II. Jessica Meis Develops her Career as a Real Estate Agent in her Home Community of Queens

When Meis began her career as a real estate agent, Meis developed her clientele and business from her substantial personal network and contacts. *August Meis Aff. at ¶2.* She supplemented her network of community friends and acquaintances with many hours of culling leads from social media and public real estate web sites. In fact, throughout the 15 months that she was affiliated with Modern Spaces, Meis is not aware that Modern Spaces ever directed a single business lead toward her. *Id. at ¶3.*

The relationship between Meis and Modern Spaces was governed by a July 2017 Independent Contractor Agreement (the "Modern Spaces ICA"). *A redacted copy of the Modern Spaces ICA is attached to the accompanying declaration of Emily Kirsch ("Kirsch Decl.") as Exhibit A.* The Modern Spaces ICA contains no non-compete

4

provision. Paragraph 10 of the Modern Spaces ICA contains the only restrictive

covenant. It precludes solicitation of Modern Spaces personnel (but does <u>not</u> preclude

solicitation of Modern Spaces' clients) and contains the following regarding purported

Proprietary Information:

> You acknowledge that any information to which you have access at
> MODERN SPACES and/or which is related to the business of MODERN
> SPACES whether printed, written or computerized, including limitation,
> open listings, exclusive listings, co-exclusive listings, co-brokers listings,
> names, addresses and telephone numbers pertaining to or in connection
> with any such listings, is deemed confidential and proprietary to
> MODERN SPACES (the "Proprietary Information").

*Kirsch Decl., Exh. A (Modern Spaces ICA)*, ¶10(a). It is self-evident that not every bit of

information to which Meis had access or that is related to Modern Spaces' business can

be proprietary. As an independent contractor, some information belongs to her, some to

other agents, some to customers, and some is publicly available information that cannot

be said to be proprietary to any person or entity.

During her affiliation with Modern Spaces, as is customary in the

industry, Meis never received any salary. *See McCarthy Decl. at* ¶7. Her only

compensation was a split of the commissions earned on transactions that she closed. *Id.*

The broker's commission paid by the client goes to the brokerage firm. *Id.* The

brokerage firm then pays to the agent an agreed upon percentage split of that amount.

*Id.* If Meis closed no transactions, she received no compensation.

On January 22, 2018, Meis gave notice she would terminate her affiliation

with Modern Spaces and affiliate with Compass. *June 13, 2018 Affidavit of Eric Benaim*

("*Benaim Aff.*") at ¶17.  Because she knew that her accounts at Modern Spaces would be immediately shut down upon giving notice, in advance of her notice, she emailed documents that she owned containing necessary and required information to her personal email account.  *August Meis Aff. at ¶8.*

### III.     The Information at Issue

*BuyersList.xlxs.*  Meis maintained a short list of individuals from her network that she believed were actively looking to purchase residential real estate in Long Island City.  *Id. at ¶7.*  She kept their names and pertinent information on a spreadsheet so that she would be able to communicate with them should she become aware of new properties that may be appropriate for their individual requirements.  *Id.* This document, comprised of a small subset of her own contacts gathered from her time in Long Island City and combing of social media and real estate web sites such as StreetEasy, was entitled Buyers List.xlxs.  *Id.  A true and correct copy of BuyersList.xlxs is attached as Exhibit B to the August Meis Aff.*  This document was called out specifically by the plaintiff as an example of a stolen trade secret (*Benaim Aff. at ¶16; Plaintiff's Memorandum of Law In Support of its Motion To Extend the Temporary Restraining Order* ("*Pl. Mov. Br.*") *at pp.12-13*) but in fact contains information that belongs to Meis. It was not provided to her by Modern Spaces, nor did the information it contained come from Modern Spaces.

*CMSData.xlxs.* According to Modern Spaces' policies and procedures, Meis was required to enter key data about her transactions upon closing into Modern Spaces' computer database (the "CMS").  Meis' understanding of the requirement was

that Modern Spaces needed the information to pay her splits on her closed transactions. *Id. at ¶5.* Therefore, Meis kept a spreadsheet on her computer tracking all her real estate deals once contracts were signed. *Id. at ¶5.* In this way, she would have all the information in one place in order to facilitate her data entry. *Id.* Once she entered the data to ensure Modern Spaces' accounting knew to pay her commission split, she used her spreadsheet as her own tracking mechanism to make sure that she was timely and accurately paid by Modern Spaces. *Id.* Because this spreadsheet maintained information that needed to be entered into CMS (and not information taken out of CMS an plaintiff wrongly contends), Meis called this document CMSData.xlx. *Id. A true and correct copy of CMSData.xlxs is attached to the August Meis Aff. as Exhibit A.* The information contained in CMSData.xlxs is called out by the plaintiff as containing trade secrets that were misappropriated (*Benaim Aff. at ¶18; Pl. Mov. Br. At pp.12-13*), but in fact contains only information of Meis' own transactions and clients that she needed to verify whether Modern Spaces was paying her commissions correctly. *Id. at ¶5.* Simply naming the document "CMS Data" does not make it proprietary to Modern Spaces. Meis never used – or accessed - CMS for any purpose other than as described above. *Id. at ¶4.* Meis does not even know whether she had credential access to any other databases or functions of CMS. *Id.*

   ***Contacts and Closed Transaction Files.*** In addition to the above two documents specifically called out by plaintiff, Meis emailed her own personal contacts that she sourced independently. *June Meis Aff. ¶9.* After those, the lions' share of the

documents she emailed herself were files of closed transactions which, under New York State Law, she is required to keep in her possession for three years. *Id.*

No-one at Compass ever requested that Meis bring any confidential information that belonged to Modern Spaces. *June Meis Aff. 10; McCarthy Decl. at ¶10.* Meis was in fact specifically instructed the opposite: that she should never disclose any confidential information she might happen to have from Modern Spaces. *Id.* At no time since she affiliated with Compass has Meis shared any of the documents she emailed to herself with any business person affiliated with Compass – or anyone else other than counsel. *August Meis Aff. at ¶12. McCarthy Decl. at ¶11.* She has shared the documents only with in-house counsel for Compass in a legal capacity only for the purpose of defending this lawsuit. *August Meis Aff. at ¶12.* Otherwise the documents remain on her personal email account.

If Meis were enjoined from using her own contacts developed from her own independent research and network of friends and acquaintances, she would be effectively prevented from earning a living; she earns no compensation other than commissions splits for signing and closing real estate transactions. *Id. at ¶13.*

## IV.   Procedural History

Modern Spaces filed a law suit in New York State Supreme Court on February 16, 2018. *A true and correct copy of the First Verified Complaint filed in New York State Supreme Court is attached to Kirsch Decl. as Exhibit B.* At some time prior to the filing of the Verified Complaint, Modern Spaces apparently searched Meis' emails and had

access to the full universe of information that she sent to her personal email address.  Perhaps because Modern Spaces was well aware as early as January 2018 that none of the information in those emails can be considered proprietary to Modern Spaces, let alone entitled to trade secret protection, plaintiff did not assert any trade secret claim and did not seek emergency relief.  Instead, plaintiff sought a cash offer from defendants to "settle" the suit. *See Affirmation of Timothea Letson, at ¶4 and Exhibit 1 thereto.*  As part of pursuing resolution in good faith, Compass counsel offered to – and did – provide Modern Spaces counsel a list of all the information Ms. Meis had in her possession in order to understand Modern Spaces' reasons for believing the information was proprietary to it (or finding out if there was additional information of which Compass was not aware that Modern Spaces believed Meis had misappropriated).  *Id.*  Modern Spaces never responded to that offer for a meaningful discussion about the nature of the information.  Rather, plaintiff's counsel merely stated that it had expected Compass to provide a monetary settlement offer.  *Id.*

Ultimately, Modern Spaces was unable to extract a payout.  Nearly *five months later*, on June 13, 2018, Modern Spaces filed an amended complaint and moved by Order to Show Cause for emergency relief.  A brief hearing was held and additional letters were submitted.  On June 28, before any ruling had been filed, entered or communicated to the parties, defendants removed to this court. Later that day, Justice Lebovits filed his decision on the Order to Show Cause (the "Order").  The parties dispute the validity of the Order, but stipulated to a limited version of the Order pending a decision from this Court on the instant motion.

9

# ARGUMENT

A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *Sussman v. Crawford,* 488 F.3d 136, 139 (2d Cir. 2007) (quoting *Mazurek v Armstrong,* 520 U.S. 968, 972 (1997).  To obtain a preliminary injunction, a moving party must show: "(1) likelihood of success on the merits: (2) likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by the relief. *JBR, Inc. v. Keurig Green Mountain, Inc.,* 618 Fed. Appx. 31, 33 (2d Cir 2015). Plaintiff fails to meet the burden on not just one – but all four elements. The preliminary injunction should be denied.

## I.    The Preliminary Injunction Should Be Denied Because There Is No Showing of Any Threat of Irreparable Harm.

The threat of irreparable injury is a *sine qua non* of a preliminary injunction: If there is no irreparable injury, there can be no preliminary injunction. *Faively Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir. 2009).  *Am. Airlines, Inc. v. Imhof,* 620 F.Supp.2d 574, 579 (S.D.N.Y. 2009). To satisfy the irreparable harm requirement, "[the moving party] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to

resolve the harm." *Faively,* 559 F.3d. at 118 (quoting *Grand River Enter. Six Nations, Ltd. v.*

*Pryor,* 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).

### A.  The Five-Month Delay in Moving for Emergency Relief Is Unreasonable

This case was initially filed on February 16, 2018, involving emails Ms.

Meis sent to herself in January 2018 and plaintiff did not seek emergency relief until

***almost five months later,*** on June 13, 2018.  This unexplained delay alone is fatal to

plaintiff's motion for emergency relief. *Citibank, N.A. v. CityTrust,* 756 F.2d 273, 276 (2d

Cir. 1985) (ten-week delay justifies denial of preliminary injunction); *Business Trends*

*Analysts v. Freedonia Gorup, Inc.*  650 F.Supp. 1452 1459-60 (S.D.N.Y 1987) (six to nine-

month delay indicates lack of irreparable harm in copyright and trade secret suit).  *See,*

*also, Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27,38 (2d Cir. 1995) ("delay in

seeking a preliminary injunction undercuts the movant's claim of irreparable harm");

*Fisher Price, Inc. v. Well Made Toy Mfg.,* 25 F.3d 119, 124, 125 n1 (2d Cir. 1994) (indicating

that three-month delay is unreasonable where there is no excuse).

Plaintiff's five-month delay is unreasonable.  Modern Spaces had the

emails and attachments in their possession on its own server since the day Meis left and

certainly had discovered them by the time they brought the lawsuit in February.  If any

of those attachments truly caused alarm, plaintiff would have moved for emergency

relief at that time. *See, e.g., Fisher-Price,* 25 F.3d 119, 125.  In *Fisher-Price,* the court

excused a five-month delay in bringing action where the time was spent actively

looking for an allegedly infringing item in stores, finding it, performing analysis, and

obtaining evidence, but the company then brought suit only two weeks thereafter.  At the same time, the *Fisher-Price* court indicated a three-month delay in bringing action from the time plaintiff had evidence of a different allegedly infringing item is "inconceivable" had the plaintiff "truly been concerned that the [infringing toy] would harm it in the toy market." *Id. at n.1.*

There is no evidence here that plaintiff was engaged in any due diligence over those five months to understand the nature or extent of the harm that the alleged misappropriation caused. There are no facts submitted with the June moving papers (or as renewed in this Court in July) that were not yet known to the plaintiff in January. Indeed, the lack of evidence of harm resulting from defendants' actions at any time between January and August is itself is evidence that the facts of this case do not give rise to the threat of irreparable harm if not enjoined.

B.  <u>The Plaintiff Has Not Met Its Burden of Demonstrating Evidence of Actual or Imminent Irreparable Harm.</u>

As a threshold matter, plaintiff wrongly asserts that it is entitled to a presumption of irreparable injury in a case involving theft of trade secrets. *Pl. Mov. Br. at 6.* The Second Circuit is quite clear that even if where true trade secrets are stolen, there is no such presumption unless there is a demonstrated danger that a trade secret will be disseminated to a wide audience thus truly impairing the trades secret's value. *Faively Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir. 2009).  But that is not the case here, where a competitor is alleged to use the secrets in pursuit of its own profits. No presumption of irreparable harm is warranted because "the only possible

12

injury that the plaintiff may suffer is loss of sales …which should be fully compensable by money damages." *Id., 559 F.3d at* 119 (quoting *Geritrex Corp. v. Dermarite Indus., LLC,* 910 F.Supp. 955, 966 (S.D.N.Y. 1996) (internal quotation marks omitted). Thus, Plaintiff must come forward with evidence to meet its burden of showing a clear likelihood of irreparable harm and it has utterly failed to do so. *See Passologix, Inc. v. 2FA Technology, LLC,* No. 08 Civ. 10986 (PKL), 2010 WL 2505628 (S.D.N.Y. June 21, 2010).

Plaintiff asserts that it faces loss of a significant part of its business or its goodwill as a result of defendants' actions. *See Pl. Mov. Br. At pp. 11-12.* This argument is wholly without merit. Such conclusory statements, devoid of supporting evidence identifying any specific losses of business relationships or in certain market segments, will not support a finding of imminent danger of irreparable harm. *See Passologix, Inc v. 2FA Technology, LLC at *10.* Indeed, plaintiff has submitted no evidence that any such thing has happened or plausibly could happen in the future. Nor has plaintiff suggested that even if it had lost the benefit of any real estate transactions to the defendants– *which it has not* – why money damages would be an inadequate remedy. *See Park W. Radiology v. CareCore Nat'l LLC,* 240 F.R.D 109, 113 (S.D.N.Y. 2007) (denying preliminary injunction where movant did not show that its services were "so unique that any alleged damages resulting from its inability to market and sell them could not be easily quantified."). The cases involving irreparable harm from a loss of goodwill or business relationships typically involve a situation in which a dispute between parties leads to the inability of one party to provide its product or products to the market or its customers. *O.P.F Optronics Ltd. V. Remington Arms Co.,* No. 08 Civ. 4746, 2008 WL

4410130 (S.D.N.Y. Sept. 26, 2008) (citations omitted).The departure of one independent contractor with her personal contacts hardly rises to that level.

The cases cited by plaintiff as upholding a preliminary injunction upon a finding of imminent or actual irreparable injury are inapposite. They involve restrictive covenants and markets where clients, by definition, are consistent repeat customers, unlike homebuyers in the Queens real estate markets. *Velo-bind, Inc. v. Scheck,* 485 F.Supp. 102, 109 (S.D.N.Y. 1979), the only case cited by plaintiff finding a customer list to be a trade secret and dates back 40 years, involves a list of companies who had previously purchased the unique, patented velo-binding machine and were thus both impossible to identify from publicly available source and were also captive customers for ongoing, guaranteed repeat purchase of the unique product supplies for use with the machines. *Velo-bind* at 109.  *Ticor Title Ins. Co., v. Cohen* involves a title insurance company seeking to enforce a non-compete agreement against a very highly paid employee who marketed title insurance to firm real estate attorneys doing large commercial real estate transactions. *Ticor Title Ins. Co., v. Cohen,* 173 F.3d 63, 69 (2d Cir. 1999).  The customer-attorneys were also ongoing consistent repeat customers for title insurance for every deal they did.  And the court in *Willis of New York, Inc. v. DeFelice* found that plaintiffs had demonstrated that one of the three defendants provided services that were unique enough to justify enforcement of his restrictive covenant to avoid the threat of irreparable injury. *Willis of New York, Inc. v. DeFelice,* 299 A.D.2d 240, 241 (1st Dept. 2002). Critically, however, the *Willis* Court refused to enforce even the unique defendant's non-solicitation as against clients that he himself had developed

and the record showed were loyal to him and not to the employer. *Id.,* 299 A.D.2d at

242.  Irreparable injury was shown only to the extent that plaintiff would lose its own

clients absent an injunction; not that plaintiff should receive a windfall of inheriting the

departing salesperson's clients when the salespersonchose to move to another company.

*Misys Intl. Banking Sys., Inc. v. TwoFour Sys., LLC,* 800 N.Y.S.2d 350 (N.Y.Sup.Ct. 2004)

involved clear breaches of non-solicitation, non-compete agreements that accompanied

the sale of a business. [1]

      Moreover, the cases cited by plaintiff as meeting the irreparable harm

requirement have relied on concrete evidence of very quick and severe harm.  For

example, the Eighth Circuit relied on evidence of the former insurance company

employer's policy cancellation rate going from 10% to 80% in the territory of the

salesperson employee who violated his restrictive covenant and diverted his existing

business to a competitor – all within the first six weeks of his departure.  *Overholt Crop*

*Ins. Service Co., v. Travis,* 941 F.2d 1361 (8th Cir. 1991).  Here, there is no evidence of any

harm, declining sales or otherwise, despite the more than six months that have elapsed

since Meis emailed documents to her personal account.  *C.f., Geritrex Corp. v Dermarite*

*Indus., LLC* 910 F.Supp. 955 (S.D.N.Y. 1996) (even evidence of declining sales by as much

---

[1] Plaintiff curiously cites *Support Sys. Assoc. v. Tavolacci,* 135 A.D.2d 704 (2d. Dept. 1987) for the proposition that Modern Spaces has lost a significant part of its business and thus will suffer irreparable harm. *Pl. Mov. Br. At p.11*. But *Support Sys. Assoc v. Tavolacci* is a damages case in which the court awarded $91,000 to compensate for a specific piece of business improperly obtained through breach of a non-solicitation restrictive covenant.

as 20% is insufficient to show irreparable injury if it is not supported with facts and if it is not able to be directly linked to the conduct of the defendants).

II. **The Preliminary Injunction Should Be Denied Because Plaintiff Is Not Likely Succeed on The Merits of Either Its DTSA or its Breach of Contract Claim.**

A. <u>Plaintiff is Unlikely to Succeed on the Merits of Its Defend Trade Secrets Act Because No Information at Issue Can be Considered a Trade Secret of Modern Spaces.</u>

Under the Defend Trade Secret Act of 2016, 18 U.S.C. §1836 *et seq.* ("DTSA"), a party must show "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or (ii) at the time of the disclosure knew, or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived through a person who owed such a duty." *Free Country, Ltd. v. Drennan,* 235 F.Supp.3d 559, 565 (S.D.N.Y. 2016) (quoting 15 U.S.C. §1839(3)(A)-(B)). As to Compass, there is no evidence that Compass disclosed or used any information that is at issue here for the simple reason that Compass never received it. The undisputed record shows that the information was shared only with counsel for the sole purpose of defending against this law suit. It is not possible to prevail on a DTSA claim against Compass. *See Free Country* 235 F.Supp.3d 559, 565-566 (court found no likelihood of success on trade secret claim where there is no evidence that corporate defendants ever came into possession of alleged trade secrets). Furthermore, there is no factual evidence that Meis "used" or "disclosed" any alleged trade secrets to anyone

16

other than counsel in connection with this suit. *See Pl. Mov. Br. At 12-14.* Indeed, she shared the information with no-one and has not used it herself.

Despite ample opportunity, Modern Spaces has not met its burden of showing that any of the information contained in any of Meis' emails was in fact a trade secret or entitled to any protection. *Production Resource Group, LLC v. Oberman*, No. 03-Civ. 5366, 2003 WL 22350939 (S.D.N.Y. Aug. 27, 2003) (trade secrets not established; preliminary injunction denied); *Broker Genius, Inc. v. Zalta,* 280 F.Supp.3d 495 (S.D.N.Y. 2017) (trade secret not established; preliminary injunction denied); *Geritrex Corp. v. Dermarite Indus. LLC,* 910 F.Supp. 955 (S.D.N.Y. 1996) (same).

Plaintiff has specifically identified only two specific documents that Meis emailed to herself as the subject of the trade secret claim: BuyersList.xlxs and CMSData.xlxs. *Pl. Mov. Br. At* ¶4. BuyersList.xlxs, which lists approximately 30 of Meis' potential real estate purchasers in the Queens area that were identified and solicited solely by Meis through her own network, social media and public real estate web sites, is certainly not a trade secret. *Free Country,* 235 F.Supp.3d at 566 ("[w]here…a contact list contains little more that publicly available information, even if it takes considerable effort to compile, it is not accorded protection under DTSA"); *Webcraft Techs., Inc. v. McCaw,* 674 F.Supp.2d 1039, 1044-45 (S.D.N.Y 1987) (finding a customer list of prospective customers "put together from easily available sources" may not have constituted a trade secret despite the fact that "considerable work [went] into compilation of the list…").

17

Plaintiff's reliance on *Velo-bind, Inc. v. Scheck,* 485 F.Supp. 102, 109 (S.D.N.Y. 1979) for the opposite proposition is misplaced. *Pl.Mov. Br. At p. 11. Velo-bind* involved lists of companies who had previously purchased the unique velo-binding machine and were thus potential customers for ongoing purchase of the unique product supplies for use with the machines. *Velo-bind* at 109. Because the velo-bind was a patented machine, only the velo-bind company and its two authorized sellers could know what customers owned or used them. *Id.* Here, the relevant market is not unique or secret – it consists of people who live or work in Long Island City.

CMSData.xlxs contains detailed information about Meis' own real estate transactions that had recently closed or would be closing soon, including pricing and commissions split information. This is not the type of "pricing" such as complex proprietary algorithms in financial institutions that has been held to be a trade secret. *Free Country,* 235 F.Supp.3d at 567 (citations omitted). Indeed, listings of closed sales for an entire company, including those that have nothing to do with the allegedly offending party, have not been deemed protectable trade secrets when salespeople use the information to verify their commissions checks, just as Meis did here. *In re Document Technologies Litigation,* 275 F.Supp.3d 454 (S.D.N.Y. 2017) (full list of company-wide invoices not considered a trade secret when departing salespeople used it to verify commissions).

Not only does the information at issue not rise to the level of protectable trade secrets, *but the information itself belongs to Meis – not to plaintiff.* In New York, customer and potential customer contacts are the property of the independent

18

contractor real estate agents who developed them, not the brokerage firm with which the agent is affiliated at any given time.  *See Shmueli v. NRT New York, Inc.,* 802 N.Y.S.2d 871, 876 (N.Y.Sup.Ct. 2005) (customer contacts and information are the property of the agent, not brokerage firm; firm held liable for misappropriation of agent's confidential information by refusing to furnish agent's customer information to her upon her resignation).  And, just as in a strikingly similar case involving the contacts of a salesman who left his employer to go work for a competitor, "there is no indication in the record that [Meis' google contacts] includes customers other than those pursued by [Meis] and there is no evidence that [Meis] took or copied the contact lists of other [Modern Spaces] salespersons." *Iron Mountain Information Management, Inc. v. Taddeo,* 455 F.Supp.2d 124, 139 (S.D.N.Y. 2006).

Indeed, it is commonplace in the salesperson context that salespeople's own cultivated potential customer lists belong to the individual salespeople and not to the company or whom they work *even when they are employees,* let alone when they are independent contractors like Meis. "[C]ommission sales[persons], as quasi-independent operators, move from employer to employer and solicit business from customer lists, open locations and sources developed through their efforts and personality. To bar such a sales[person] from selling to such former customers in a new employment (where no clear equitable or contractual impediment exists) would severely impede or utterly destroy the ability of the employee to earn a livelihood." *Iron Mountain* 455 F.Supp. at 139 (quoting *Candler Coffee Corp. v. Eigenfeld,* 432 N.Y.S. 816, 819, *aff'd* 87 A.D.2d 569 (1st Dep't 1982)). This is only all the more true in the independent contractor context.

B. <u>Plaintiff is Not Likely To Succeed on the Merits of Its Breach of Contract Claim.</u>

The non-disclosure provision of paragraph 10(a) of the Modern Spaces ICA is impermissibly overbroad and as such, unenforceable.  *See, e.g., Columbia Ribbon & Carbon Mfg. Co., Inc. v. A-1-A Corp.,* 42 N.Y.2d 496, 498 (1977) (striking similar provision as "too broad-sweeping" and did no more than "baldly restrain competition.").  The stricken *Columbia Ribbon* provision, that employee could "not divulge any other information that he has or shall have acquired during his employment, insofar as the same is or may be necessary, to protect the Company's business" is nearly identical to paragraph 10(a) here: that allegedly Proprietary Information includes "any information to which [Meis] ha[s] access at Modern Spaces and/or which is related to the business of Modern Spaces…" The Modern Spaces ICA cannot turn otherwise publicly available information, such as listing information, into the private property of Modern Spaces and preclude Meis from using information the rest of the world can use.  This not only would be a non-sensical result, but also imposes an unfair restraint on Meis that she becomes tied to Modern Spaces and cannot be effective or successful as a sales agent anywhere else.

Under the three-part test adopted by the New York Court of Appeals, a restrictive covenant is enforceable only where it: "(1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 388–89 (1999). Paragraph 10(a) of the Modern Spaces ICA

20

simply cannot be applied to the information at issue in this case. As explained above, that information is simply not a legitimate company interest of plaintiff because this information (i) is not a trade secret and, (ii) even more importantly, to the extent it belongs to anyone, it belongs to Meis, not the plaintiff. *Shmueli,* 812 N.Y.S.2d at 876. Plaintiff's citations to the contrary are simply inapposite. *Apfel v. Prudential-Bache Sec.,* 81 N.Y.2d 470 (1993) stands for the proposition that the courts will not examine or weigh the adequacy of consideration in a contract; and *W.W.W. Assoc. v. Giancontieri,* 777 N.Y.2d 157 (1990) addresses when a court may or may not look to extrinsic evidence to construe a provision. Neither case is concerned with the well-developed body of law of restrictive covenants and public policy in New York that is relevant here. Plaintiff is unlikely to succeed on its breach of contract claim.

**III.     The Balance of Equities Favors Denial of The Preliminary Injunction**

By seeking to prevent Meis from using the contacts she acquired, researched and developed on her own and her other owned information developed as an independent contractor, Modern Spaces is essentially seeking to prevent her from competing in the Long Island City and Queens real estate market against Modern Spaces. This is Meis' only source of compensation and should the injunction issue, Meis would be effectively prevented from pursuing her career and earning a livelihood. By contrast, Modern Spaces faces no hardship should the injunction not issue. It may have to compete with Meis and/or Compass in Queens, but Meis' own contacts and personal materials are not proprietary information or trade secrets belonging to Modern Spaces.

21

Fair competition is not a hardship. *Production Resource Group, LLC v. Oberman,* No. 03

Civ 5366, 2003 WL 22350939 (S.D.N.Y. August 27, 2003).

**IV.    Issuance of a Preliminary Injunction Will Disserve the Public Interest**

        The same argument applies to the public interest. To the extent a non-

disclosure agreement is so overbroad that it effectively functions as a non-competition

agreement that wasn't bargained for and does not protect actual legitimate company

interests, it is unreasonable. Restrictive covenants are themselves enforceable only to the

extent they are reasonable.  *BDO Seidman v. Hirschberg,* 93 N.Y.2d 382, 388-89 (1999);

*Reed Roberts Assoc. v. Strauman,* 40 N.Y.2d 303, 307 (1976).  To interpret the ICA as

plaintiff suggests or to deem an independent contractor's contacts and related

information developed and synthesized solely by her as proprietary to the company, is

unreasonable. If the Modern Spaces ICA provision would have been unenforceable as a

restrictive covenant, it stands to reason that it is equally so when disguised as an

impermissibly overbroad non-disclosure provision. Indeed, it should be viewed with

more suspicion because the individual independent contractor would be unable to see it

for what it was at the time of signing.

22

## CONCLUSION

For the reasons stated above, Defendants respectfully request that Plaintiff's Motion for a Preliminary Injunction be denied in its entirety.

Dated: August 17, 2018
      New York, New York

KIRSCH & NIEHAUS, PLLC

Emily Bab Kirsch (EB 4216)
150 East 58th Street
22nd Floor
New York, NY 10155
Tel: (212) 832-0170
Emily.Kirsch@kirschniehaus.com

23

## Certificate of Service

I, Emily Bab Kirsch, hereby certify that on August 17, 2018, I caused true and correct copies of Defendants' Memorandum of Law in Opposition To Plaintiffs' Motion for Preliminary Injunction; Affidavit of Jessica Meis, August 16, 2018; Affidavit of Jessica Meis, June 18, 2018; Declaration of Dennis D. McCarthy, August 16, 2018; Affirmation of Timothea Letson, June 2018; and the Declaration of Emily Bab Kirsch, August 17, 2018 to be served by e-mail and federal express upon:

> Marc A. Lavaia
> Avi Lew
> Warshaw Burstein LLP
> 555 Fifth Avenue
> New York, NY 10017
> mlavaia@wbny.com
> alew@wbny.com

Dated:      August 17, 2018
            New York, New York

Emily Bab Kirsch

1