UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1 16 19

L.I. CITY VENTURES, d/b/a/ MODERN
SPACES,

                    Plaintiff,

          v.

URBAN COMPASS, INC., d/b/a/ COMPASS,
and JESSICA MEIS,

                    Defendants.

**ORDER**

18 Civ. 5853 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          Plaintiff L.I. City Ventures, LLC, d/b/a Modern Spaces ("Modern Spaces"),

asserts claims against Urban Compass, Inc., d/b/a Compass, and Jessica Meis for breach of

contract, tortious interference with contract, misappropriation of trade secrets, unfair

competition, and tortious interference with prospective economic relations. Modern Spaces and

Urban Compass are competing real estate brokerage firms, and Meis is a real estate agent who

formerly worked at Modern Spaces, but who now works for Urban Compass. (See Am. Cmplt.

(Dkt. No. 1-2) ¶ 1; Benaim Aff. (Dkt. No. 10-2) ¶¶ 7, 17; Meis Aff. (Dkt. No. 24) ¶¶ 2-4)

Plaintiff claims that – prior to Meis' departure from Modern Spaces in January 2018 – she

emailed numerous documents containing Plaintiff's trade secret information to her personal

email account. Plaintiff also claims that Meis thereafter shared Plaintiff's trade secret

information with Urban Compass.

          Pending before the Court is Plaintiff's motion for a preliminary injunction

enjoining Defendants from, inter alia, using or disclosing Plaintiff's trade secret information or

soliciting Modern Spaces' clients. For the reasons stated below, Plaintiff's motion will be denied.

<h1 style="text-align:center">BACKGROUND</h1>

## I.    PROCEDURAL HISTORY

Plaintiff filed this action in New York Supreme Court on February 6, 2018. (See Cmplt. (Dkt. No. 1-1)) On June 12, 2018, Plaintiff filed an Amended Complaint, which added a claim for trade secret misappropriation in violation of the federal Defend Trade Secrets Act. (See Am. Cmplt. (Dkt. No. 1-2) ¶¶ 67-80) On June 13, 2018, Plaintiff moved for a temporary restraining order and preliminary injunction in state court. (See Pltf. Br. in Supp. of Preliminary Inj. (Dkt. No. 1-6))

On June 19, 2018, the state court issued a temporary restraining order prohibiting Urban Compass from (1) using "any of Modern Spaces' Proprietary Information that Meis emailed to herself in January 2018,"; and (2) communicating with "Modern Spaces' clients and employees that were disclosed to [Urban] Compass by Meis." The TRO also prohibited Meis from (1) communicating with

> any client of Modern Spaces that she communicated with while at Modern Spaces and for which Modern Spaces had an exclusive listing at the time Meis worked at Modern Spaces, or otherwise seeking to divert such client's patronage or business, in whole or in part, from Modern Spaces to any person or firm, including but not limited to, [Urban] Compass, or otherwise seeking to interfere with the business relationship between Modern Spaces and any client of Modern Spaces;

and (2) "using or disclosing to third parties, including without limitation [Urban] Compass, Modern Spaces' Proprietary Information." (State TRO (Dkt. No. 10-7)) Although the TRO was signed on June 19, 2018, it was not filed until June 28, 2018. (Id.)

On June 28, 2018 – the same day that the state court TRO was filed – Defendants removed this action to federal court. (See Notice of Removal (Dkt. No. 1))[1] On July 12, 2018, Plaintiff filed a motion to extend the state court's temporary restraining order, and requested that this court enter a preliminary injunction granting Plaintiff broader relief than that provided in the TRO. (See Mot. (Dkt. No. 10); Pltf. Br. (Dkt. No. 11)) The Court scheduled a hearing on the application to extend the temporary restraining order and to issue a preliminary injunction for July 20, 2018. (Order (Dkt. No. 12)) The parties subsequently stipulated to an adjournment of that hearing to September 5, 2018, and further stipulated to the entry of a TRO "pending a decision on plaintiff's motion for preliminary injunction, with the exception that Jessica Meis will be allowed to use her personal contacts, including her Google Contact list." (July 16, 2018 Defs. Ltr. (Dkt. No. 13) at 1; July 17, 2018 Jt. Ltr. (Dkt. No. 16))

Plaintiff's filings in support of its request for a preliminary injunction assert that – prior to Meis's departure from Modern Spaces – she had emailed to herself numerous documents containing Modern Spaces' trade secret information, in violation of her Independent Contractor Agreement with Modern Spaces. (See Pltf. Br. (Dkt. No. 11) at 9-10, 17-19; Pltf. Reply Br. (Dkt. No. 29) at 5, 10-13) However, Plaintiff did not provide the Court with copies of the documents allegedly containing trade secret information, nor did Plaintiff adequately explain why the information contained in these documents constitutes trade secrets.

At the September 5, 2018 hearing, the Court informed the parties that it could not rule on the motion for a preliminary injunction until Plaintiff identified the information it

---

[1] The Notice of Removal filed on June 28, 2018 was deficient, in that the name of the filer on the Notice of Removal was incorrect. On June 29, 2018, Defendants filed a corrected Notice of Removal. (See Notice of Removal (Dkt. No. 4))

believes constitutes trade secrets. (Sept. 5, 2018 Tr. (Dkt. No. 47) at 5) The parties then requested the opportunity to participate in a settlement conference. (Id. at 31, 36)

The parties' settlement discussions were not successful. Accordingly, on November 14, 2018, the Court ordered Plaintiff to submit "(1) a clear list of what Plaintiff claims is the proprietary, confidential, trade secret information that Defendant Meis took when she ceased working for Plaintiff; (2) the actual files Plaintiff claims Defendant Meis forwarded to her personal e-mail, rather than only the cover emails; and (3) legal authority demonstrating that these materials constitute trade secret information." (See Order (Dkt. No. 40))

Plaintiff subsequently submitted a supplemental reply declaration, along with three documents that Plaintiff argued "undoubtedly constitute proprietary and/or trade secret information."[2] (See Levaia Supp. Reply. Decl. (Dkt. No. 42) ¶ 5) Plaintiff also submitted a brief arguing that these documents constitute trade secrets under both federal and New York law. (See Pltf. Supp. Reply Br. (Dkt. No. 43)) Defendants, in response, submitted, inter alia, a copy of the Independent Contractor Agreement between Modern Spaces and Meis. (Meis Supp. Aff., Ex. A (Dkt. No. 46-2) at 11-16) Defendants also submitted a supplemental brief disputing Plaintiff's claim that the three exhibits submitted to the Court contain trade secrets. (Defs. Supp. Br. in Opp. (Dkt. No. 46-1))

---

[2] The Court granted Plaintiff's request to file the allegedly proprietary and trade secret documents under seal, based on Plaintiff's representation that "the customer lists which are attached to the Supplemental Declaration . . . contain certain confidential information about Plaintiff's clients including such information as clients' budgets as well as other confidential mortgage information which is not obtainable through public sources." (See Dkt. No. 41)

## II.    RELEVANT FACTS

### A.    Meis's Work at Modern Spaces

Between the summer or fall of 2016 and January 2018, Meis worked as a real

estate agent for Modern Spaces. (Benaim Aff. (Dkt. No. 10-2) ¶ 7; Meis Aff. (Dkt. No. 24) at ¶

3)[3] In July 2017, Meis and Modern Spaces executed an agreement governing Meis's work for

Modern Spaces (the "Agreement"). (Meis Supp. Aff., Ex. A (Dkt. No. 46-2) at 11-16)

#### 1.    Meis's Independent Contractor Agreement

The Agreement contains several provisions addressing Modern Spaces' "Proprietary

Information":

> 7) Termination. . . . In the event of your termination for any reason:
> . . . .
> c) You will not utilize or disclose to others any Proprietary Information (defined below), including without limitations, any confidential information given to MODERN SPACES or its representatives by MODERN SPACES or by a client of MODERN SPACES without written permission of MODERN SPACES and the client.
> . . . .
> 10) Use and Disclosure of Proprietary Information/Non-Solicitation/Remedies
>
> a) You acknowledge that any information to which you have access at MODERN SPACES and/or which is related to the business of MODERN SPACES whether printed, written or computerized, including without limitation, open listings, exclusive listings, co-exclusive listings, co-brokers listings, names, addresses and telephone numbers pertaining to or in connection with any such listings, is deemed confidential and proprietary to MODERN SPACES (the "Proprietary Information"). You should upon termination of your association with MODERN SPACES for any reason or at the request

---

[3]  In affidavits submitted in opposition to Plaintiff's motion, Meis has variously stated that her work for Modern Spaces began in September 2016 (Meis Aff. (Dkt. No. 24) at ¶ 3) and in August 2016. (Meis Supp. Aff. (Dkt. No. 46-2) ¶¶ 3, 8). The Amended Complaint states that Meis "began her association with Modern Spaces as a real estate agent in November 2017, executing a formal Independent Contractor Relationship Agreement with Modern Spaces in July 2017." (Am. Cmplt. (Dkt. No. 1-2) ¶ 16) Given the date of the Independent Contractor Relationship Agreement, the "November 2017" date appears to be a typographical error. The affidavit of Eric Benaim, Modern Spaces' chief executive, states that "Defendant Meis began her association with Modern Spaces as a real estate agent in November 2016, executing a formal Independent Contractor Relationship Agreement with Modern Spaces in July 2017." (Benaim Aff. (Dkt. No. 10-2) ¶ 7)

of MODERN SPACES at any time, you shall (i) immediately turn over to MODERN SPACES all written materials then in your possession concerning the Proprietary Information, together with all copies thereof and all notes with resect thereto, and (ii) not utilize or disclose to others any proprietary information without the written permission of MODERN SPACES.

b) You covenant and agree that, during the term of this Agreement and for a period ending upon your termination with MODERN SPACES, you will not solicit, employ, engage or in any manner encourage any current or former employee, independent contractor broker or salesperson of MODERN SPACES to leave its employ, directly or indirectly, for the employ of a person or entity which directly or indirectly competes with MODERN SPACES.

c) You acknowledge and agree that neither monetary damages nor any other ready [sic] at law will be adequate or sufficient to protect MODERN SPACES from any threatened or actual breach by you of any of your obligations contained in this section of the agreement. Accordingly, you agree that, in the event of a breach or threatened breach of any such obligations, in additions [sic] to and not in lieu of any damages sustained by MODERN SPACES and any other remedies which MODERN SPACES may have, MODERN SPACES shall have the right to equitable relief, including, without limitation, the issuance of any injunction by any such breach or threatened such, without the necessity of proving actual damage or posting a bond.

(See Meis Supp. Aff., Ex. A (Dkt. No. 46-2) ¶¶ 7, 10)

Other provisions in the Agreement emphasize Meis's status as an independent contractor, and acknowledge that Meis would solicit brokerage business beyond Plaintiff's own listings and clients:

2) Listings[.] The Company agrees to make available to you all current Company listings, such listings as the Company chooses to place exclusively in the possession of some other salesperson. The Company agrees to assist, advise, and cooperate with you to facilitate the transaction of real estate business by you. If you solicit and/or procure real estate listings, which are not listed with the Company, you must offer to place such listings with the Company and the Company will advise you in writing whether or not it wishes to accept such listings.

3) Compensation/commission. As your sole compensation for services rendered to MODERN SPACES, you will be paid commissions in accordance in agreement [sic] amount of fifty percent (50%) between you and MODERN SPACES. . . . You will not receive any remuneration related to the number of hours you work or be treated for any purpose as an employee of MODERN SPACES.

4) Independent Contractor. You will be treated as an independent contractor and not as an employee of MODERN SPACES for any purpose. . . . This Agreement shall not render you an employee, partner, agent of, or joint venture with the Company for any purpose. You shall not enter into or make any commitment for or in the name of Company.

(Id. at ¶¶ 2, 3, 4)

## 2. Meis's Alleged Access to Plaintiff's Proprietary, Confidential Information

According to Plaintiff, while Meis worked at Modern Spaces, she was privy to the company's confidential, proprietary information, including the company's "clients, listings, business operations, strategies, assets," financial affairs, and "present and future projects and developments." (Benaim Aff. (Dkt. No. 10-2) ¶ 10) Meis had access to Modern Spaces' Customer Management System ("CMS") database, landlord listings, developer information, and leads generated by Modern Spaces. (Id. ¶ 11) According to Plaintiff, Modern Spaces' "client and owner lists contained valuable, non-public information that was developed . . . by Modern Spaces over years of diligence, hard work, and considerable expense." (Id.) Moreover, "Modern Spaces provide[d] leads to its agents daily, on a first come, first served basis," and "Meis received leads just by being in the office, all directly from Modern Spaces' owners." (Benaim Reply Aff. (Dkt. No. 28) ¶ 5)

Defendant Meis disputes Plaintiff's representations concerning her access to the CMS database. (Meis Aff. (Dkt. No. 23) ¶ 4) Meis asserts that she "did not have access to any confidential or proprietary information in the CMS. I had login credentials which granted me access to input my own data relating to deals that I closed. If I had any other access, I was not aware of it and I did not know how to use it." (Id.) Meis also disputes Plaintiff's allegations concerning her access to "leads": "To the best of my knowledge and recollection, Modern

7

Spaces never gave me a single lead to work or a single property listing. Every deal I signed or closed while at Modern Spaces was sourced on my own." (Id. ¶ 3)

Plaintiff has, however, offered evidence that it supplied Meis with at least some direct "lead[s] to work." Plaintiff has submitted six emails – all dated between February and May 2017 – which Modern Spaces principal Ted Kokkoris forwarded directly to Meis; each email is an inquiry from an individual searching for an apartment.[4] For example, an email from Jesse Cahill dated February 20, 2017 reads: "Dear Sir or Madam, My wife and I are beginning to investigate purchasing a two-bedroom apartment in or around Manhattan. We'd love to talk to someone about what availabilities you may have. Best, Jesse." (Benaim Reply Aff. Ex. A (Dkt. No. 28-1) at 3)

On January 22, 2018, Meis terminated her affiliation with Modern Spaces, and announced that she would begin working for Urban Compass. (Benaim Aff. (Dkt. No. 10-2) ¶ 17) As discussed below, prior to her departure Meis sent numerous emails from her Modern Spaces' email account to her personal account, with various attachments. (Id. ¶¶ 18-21; Emails (Dkt. No. 10-2) at 19-48)

**B.    The Alleged Proprietary Information Meis Emailed to Her Personal Email Account**

Plaintiff asserts that each email Meis sent to herself included multiple attachments containing Modern Spaces' proprietary information, and that Meis shared at least some of this

---

[4] The subject of each email is "New submission from Contact Us." The Court understands "Contact Us" to be a submission form on Modern Space's website. (See https://www.modernspacesnyc.com/contact/ (last accessed January 11, 2019 at 10:52 a.m.)) The forwarded information includes the name, email address, and telephone number of the person inquiring about finding an apartment, as well as the content of the inquirer's message to Modern Spaces. (Benaim Reply Aff. Ex. A (Dkt. No. 28-1)) All of the emails submitted by Plaintiff were sent before the Agreement between Meis and Modern Spaces was executed.

information with Urban Compass. (Benaim Aff. (Dkt. No. 10-2) ¶¶ 18, 21) Meis does not dispute that she sent emails from her Modern Spaces email address to her personal email account, but she denies that these emails contained Modern Spaces' proprietary information. (Meis Aff. (Dkt. No. 23))

Meis's explanation for the emails is as follows: "Just before I gave my notice to Modern Spaces that I would be leaving to affiliate with [Urban] Compass, I emailed certain documents to myself for my own records. I did so because I knew that as soon as I gave notice my accounts would be cut off."[5] (Id. ¶ 8) According to Meis, most of the documents she emailed to herself "are files relating to transactions I closed that I am required to maintain in my possession for three years past closing."[6] (Id. ¶ 9)

Defendants have submitted "a spreadsheet . . . listing what [they] believe[] to be the universe of emails that Ms. Meis forwarded to her personal account prior to her departure [from Modern Spaces]." (Kirsch Supp. Decl. (Dkt. No. 46-3) ¶ 6) For each of the 59 emails sent from Meis's Modern Spaces email address to her personal email address between January 14, 2018 and January 20, 2018, this ten-page spreadsheet lists the date and subject of the email, attachments (if any), and notes (if any). (See Dkt. No. 10-4)

---

[5] Defendants have submitted an email exchange that took place on January 23, 2018 and January 24, 2018 between Meis and Lisa Ingardia, Managing Director of Modern Spaces. In this exchange, Meis asks, "any way my emails could be retrieved and sent to me? I would appreciate it if they could but I understand if they can't." Ingardia responds: "I'll follow up on any emails you should receive, but we did terminate the gmail account." (Meis Supp. Aff., Ex. B (Dkt. No. 46-2) at 19-22)) The Court assumes that the "gmail account" referenced here is Modern Spaces email account for Meis, likely created through Gmail.

[6] New York's Real Property Law requires sellers' agents or landlords' agents to provide buyers and tenants with a disclosure form, obtain a signed acknowledgement, and "maintain a copy of the signed acknowledgement for not less than three years." See N.Y. Real Prop. Law § 443 (McKinney's).

Defendants maintain that these emails contain "no proprietary or trade secrets belonging to Modern Spaces," and have challenged Plaintiff to "(a) explain why any of those documents [listed in the spreadsheet] might be proprietary . . . or (b) inform [defense] counsel . . . [how] the list [is] incomplete. . . ." According to Defendants, Plaintiff has never responded to that challenge. (Kirsh Supp. Decl. (Dkt. No. 46-3) ¶¶ 6-7)

In support of its claim that Meis emailed Plaintiff's proprietary information to her personal email address, Plaintiff cites three Excel files listed on the spreadsheet as attachments to emails Meis sent herself: a file entitled "OLR MyCustomers.xls."; a file named "CMSData.xlxs" from an email entitled "CMS Data on Rentals/Sales"; and a file named "BuyersList.xls."[7] (Benaim Aff. (Dkt. No. 10-2) ¶ 18; Meis Aff. (Dkt. No. 23) ¶¶ 5-7, 9; Benaim Reply Aff. (Dkt. No. 28) ¶¶ 7, 10; Pltf. Supp. Reply, Exs. E, F, G (Dkt. Nos. 42-5, 42-6, 42-7))[8]

---

[7] Earlier in this litigation, Plaintiff also pointed to an Excel file entitled "Mailing_List.xls," which contains 1,155 names and addresses of owners of various properties in Long Island City. (Benaim Reply Aff. (Dkt. No. 28) ¶ 10) In responding to this Court's November 14, 2018 Order to list all proprietary and confidential materials that Plaintiff contended Meis had emailed to her personal email address, however, Plaintiff did not cite this file. (See Levaia Supp. Reply Decl. (Dkt. No. 42) ¶ 5 (identifying only "Exhibits E, F, & G" – which correspond to the OLR Customers file, the CMS Data Rentals/Sales document, and the Buyers List – as files that "undoubtedly constitute proprietary and/or trade secret information."))

[8] Plaintiff claims that it is "impossible" to identify other documents that Meis emailed to her personal account that contain confidential and proprietary information. (Levaia Supp. Reply Decl. (Dkt. No. 42) ¶ 16) According to Plaintiff, "the documents which Meis sent to herself were sent through an internet server which Plaintiff cannot access, and Meis deleted the emails from her 'sent' emails. Thus, Plaintiff cannot possibly identify precisely what was sent without receiving the documents taken by Meis which Defendants were supposed to produce." (Id. ¶ 17)

Plaintiff's alleged inability to access the emails at issue is difficult to understand. Plaintiff's August 30, 2018 submissions to this Court include emails forwarded from Meis's Modern Spaces email account. (See Benaim Reply Aff. Exs. A, C (Dkt. Nos. 28-1, 28-3)) Moreover, during a September 5, 2018 hearing at which the Court instructed Plaintiff's counsel that all emails containing alleged proprietary information would have to be produced in this litigation, Plaintiff's counsel did not assert that Plaintiff could not access these allegedly proprietary documents. (See, e.g., Sept. 5, 2018 Tr. (Dkt. No. 47) at 11 ("Just to be clear, your Honor, the reason why the papers didn't initially have the actual information and only the cover sheets of

The Court considers each of these documents below.

OLR Customer List

Plaintiff cites a January 13, 2018 email with the subject line "OLR customers." The email was sent from Meis's Modern Spaces email address to her personal AOL email address, and then forwarded from the Modern Spaces email account to Meis's personal Gmail email account on January 14, 2018.[9] (Levaia Supp. Reply Dec., Ex. E (Dkt. No. 42-5)) This email contains – as an attachment – a two-page spreadsheet with 51 row entries. In addition to basic customer contact information such as name, telephone number, and email address, the spreadsheet columns include headings entitled "Created," "Activity," "Status," and "Origin." Below the "Created" and "Activity" headings are dates ranging from September 2016 to December 2017; the "status" of all but two row entries is "active." Below the "Origin" column are entries stating either "personal referral," "Street Easy," "Other Source," or – in one case – "Facebook." (Id. at 3-4)

According to Plaintiff, the OLR Customer List "was derived from Plaintiff's OLR company account, and the attachment includes the names and addresses of Plaintiff's customers." (Levaia Supp. Reply Dec. (Dkt. No. 42) ¶ 6) Defendant Meis contends, however, that the spreadsheet "does not include a single piece of data input by Modern Spaces, or by any other agent with Modern Spaces." (Meis Supp. Aff. (Dkt. No. 46-2) ¶ 6) According to Meis, OLR, or "Online Residential," "is a listing and customer management platform for real estate agents . . . that feeds into the master listings sharing system available to members of the Real

the emails was because of my concern that . . . by putting this on the system, so to speak, it becomes public.")) In any event, Plaintiff's application for a preliminary injunction will be decided on the basis of the documents that have been submitted to the Court.

[9] It is not clear from the email chain provided to the Court how this email was forwarded from Meis's Modern Spaces email account to her Gmail account.

11

Estate Board of New York." (Id. at ¶ 5)  Meis "placed all serious potential buyer and rental customer leads that [she] procured through [her] Social Media marketing, [or] that [she] individually paid for as 'paid leads' from publicly available resources such as Streeteasy or Zillow, or that [she] procured through [her] sphere of influence, referrals, friends, or acquaintances into the OLR platform in order to send them active listings based on criteria the potential customers and [Meis had] discussed." (Id.)

Plaintiff has demonstrated that its principal – Ted Kokkoris – provided Meis with the name of one of the customers listed on the OLR Customer List – Jesse Cahill. (See Benaim Reply Aff. Ex. A (Dkt. No. 28-1) at 2-4)  Plaintiff has not demonstrated that Modern Spaces was the source for any other information reflected in the OLR Customer List, however.

CMS Data Rentals/Sales

Plaintiff also cites a January 13, 2018 email with the subject line "CMS Data Rentals/Sales."  This email was likewise sent from Meis's Modern Spaces email address to her personal AOL email address, and then forwarded from the Modern Spaces email account to Meis's personal Gmail email account on January 14, 2018. (Levaia Supp. Reply Dec., Ex. F (Dkt. No. 42-6))  This email contains two spreadsheet attachments.  The first spreadsheet, which appears to concern rental properties, contains ten columns with the headings:  "Name," "Address," "Unit," "Lease signed," "Lease Date," "Commission Amount," "Split with Agent," "Commission After Splits," "Commission Paid Date," and "Entered into CMS."  Under these headings are sixteen rows of information. (Id. at 4)  The second spreadsheet, which appears to concern properties for sale, contains  seven columns with similar headings:  "Name," "Address," "Sales Price," "Commission %," "Commission Total," "Commission Split," and "Splits with Agent?"  Under these headings are nine rows of information. (Id. at 5)

According to Plaintiff, "[t]he CMS Data is a reference to the system owned by Modern Spaces and the attachment contains a list of names of individuals, many of whom are names which the leads were given to Meis by Modern Spaces." (Levaia Supp. Reply Dec. (Dkt. No. 42) ¶ 7) Plaintiff has not offered any evidence that the names on the spreadsheets correspond with leads Plaintiff provided to Meis, however.

Defendant Meis asserts that the CMS Data spreadsheet "is an excel spreadsheet that [she] made and updated to keep track of [her] own pending and closed deals from August 2016 - January 2018 (the term of [her] affiliation with Modern Spaces). The spreadsheet contains all of the necessary information that [she] was required to enter **into** Modern Spaces' CMS database per Modern Spaces' request. Agents affiliated with Modern Spaces were advised that they would not be paid their commissions due unless and until required data regarding the closed deals w[ere] entered into the CMS System." (Meis Supp. Aff. (Dkt. No. 46-2) ¶ 10) (emphasis in original). Meis further asserts that "this spreadsheet lists only deals that [she] alone worked on. Neither Modern Spaces, nor any of its employees or agents, worked on these deals." (Id. ¶ 11) Moreover, five of the deals listed on this spreadsheet were still pending when Meis resigned from Modern Spaces; the information relevant to those deals was thus never entered into the CMS database. (Id. ¶¶ 12-13)

Buyers List

Plaintiff also relies on a January 13, 2018 email with the subject line "Buyers List." This email was likewise sent on January 13, 2018 from Meis's Modern Spaces email address to her person AOL email address, and was then forwarded from the Modern Spaces email account to Meis's personal Gmail account on January 14, 2018. (See Benaim Aff., Ex. B (Dkt. No. 10-2) at 21) Attached to these emails is a four-page spreadsheet. The first two pages

contain columns headed "Client Name," "Budget," "Size," "Location," "Pre-Approved," and "%
Down at closing." Below these headings are 33 rows of corresponding information. The third
and fourth pages of this spreadsheet contain columns headed "Other," and "In Contract," and list,
inter alia, several property addresses. (Levaia Supp. Reply Dec., Ex. G (Dkt. No. 42-7))
(Benaim Aff. (Dkt. No. 10-2) ¶ 18; Meis Aff. (Dkt. No. 23) ¶ 7, Ex. B)

According to Plaintiff, the Buyers' List spreadsheet "is a list of names of clients
of Modern Spaces," and reflects "approximately $30 million in [potential] sales," which
corresponds to more than "one million dollars in real estate commissions." (Levaia Supp. Reply
Dec. (Dkt. No. 42) ¶ 8) The list of names includes Jesse Cahill. Plaintiff has offered no
evidence that the other names found in the Buyers List are Modern Spaces clients, or that Meis
obtained these names from Modern Spaces.

According to Defendant Meis, the Buyers List "is an excel spreadsheet that [she]
made to remind [herself] of key information discussed with a new potential buyer during an
initial buyer interview" conducted over the telephone; these buyers "presumably reach out to
every broker in town . . . and offered these basic facts about their interests freely so that a broker
could suggest properties that matched their interests." (Meis Supp. Aff. (Dkt. No. 46-2) ¶¶ 14-
15)

## DISCUSSION

Plaintiff seeks an order

(i)  preliminarily enjoining and restraining [Urban] Compass and its employees, agents
and/or representatives, from using, disclosing, disseminating and/or exploiting any of
Modern Spaces' Proprietary Information (as that term is defined in the Agreement
entered into between [Meis] and Modern Spaces (the "Agreement"), and from soliciting,
initiating communications with, corresponding with or contacting Modern Spaces' clients
and [employees] pursuant to the Agreement; preliminarily enjoining and restraining Meis
from, directly or indirectly, soliciting, initiating[] communications with, corresponding
with or contacting (in any manner, including, but not limited to, electronically) any client

14

of Modern Spaces, or otherwise seeking to divert a client of Modern Spaces' patronage or business, in whole or in part, from Modern Spaces to any other person or firm, including, but not limited to, [Urban] Compass, or otherwise seeking to interfere with the business relationship between Modern Spaces and any client of Modern Spaces;

(ii) preliminarily enjoining and restraining Meis from, directly or indirectly, soliciting, hiring, assisting in hiring, initiating communications with, corresponding with or contacting (in any manner, including, but not limited to, electronically) any current partner, employee or consultant of Modern Spaces, or otherwise seeking to in any way interfere with the relationship between Modern Spaces and any Modern Spaces partner, employee or consultant;

(iii) preliminarily enjoining and restraining Meis from using or disclosing to third parties, including without limitation [Urban] Compass, Modern Spaces' Proprietary Information (as that term is defined in the Agreement);

(iv) directing defendants to immediately deliver to Modern Spaces' counsel all originals and copies (including, but not limited to, copies on computer disks, computer hard drives or other electronic formats) of any and all Proprietary Information (as that term is defined in the Agreement). . . .

(See Pltf. Br. (Dkt. No. 11) at 22; State TRO (Dkt. No. 10-7) at 3-4)

## I.  **LEGAL STANDARD**

In the Second Circuit, a court may issue a preliminary injunction only where

the plaintiff has demonstrated "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor." Second, the court may issue the injunction only if the plaintiff has demonstrated "that he is likely to suffer irreparable injury in the absence of an injunction." . . . Third, a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor.  Finally, the court must ensure that the "public interest would not be disserved" by the issuance of a preliminary injunction.

Salinger v. Colting, 607 F.3d 68, 79–80 (2d Cir. 2010) (citations omitted); see also Louis Vuitton

Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 113-14 (2d Cir. 2006).[10]

---

[10] "Where the movant seeks a mandatory injunction (one that will alter the status quo) rather than a prohibitory injunction (one that maintains the status quo), the likelihood-of-success standard is elevated:  the movant must show a clear or substantial likelihood of success." Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 97 (2d Cir. 2005) (citing Rodriguez ex

For reasons that will be explained below, Plaintiff has not demonstrated a likelihood of success on the merits or sufficiently serious questions going to the merits. Accordingly, Plaintiff's request for a preliminary injunction will be denied.

## II.  ANALYSIS

### A.  Likelihood of Success on the Merits

"To establish a likelihood of success on the merits, a plaintiff need not show that success is certain, only that the probability of prevailing is better than fifty percent." Citibank, N.A. v. Norske Skogindustrier ASA, No. 16 Civ. 850 (RJS), 2016 WL 1052888, at *3 (S.D.N.Y. Mar. 8, 2016) (internal quotation marks and citations omitted).

Modern Spaces contends that it has shown a likelihood of success on its claims against (1) Meis and Urban Compass for unfair competition under New York law; (2) Meis and Urban Compass under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1831 et seq.; and (3) Meis for breach of contract. (Pltf. Br. (Dkt. No. 11) at 18-19; Pltf. Reply Br. (Dkt. No. 29) at 12-13)

---

rel. Rodriguez v. DeBuono, 175 F.3d 227, 233 (2d Cir. 1999) (citing Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996))). A mandatory injunction alters the status quo by requiring a party to perform "some positive act." Nicholson v. Scoppetta, 344 F.3d 154, 165 (2d Cir. 2003) (internal quotation marks and citation omitted).

To the extent that Plaintiff seeks to enjoin Defendants from soliciting, initiating communications with, or contacting any client of Modern Spaces, it arguably alters the status quo, because there is no non-solicitation clause in the Agreement. See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 35 (2d Cir. 1995) ("Because the preliminary relief arguably alters the status quo by doing more than is required by the Agreement, it might be considered mandatory.") The issue need not be resolved, however, because Plaintiff has not shown that it is entitled to relief under even the less stringent preliminary injunction standard.

## 1.    **Unfair Competition Claim**

"The essence of a misappropriation unfair competition claim under New York law 'is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship.'" Small Bus. Bodyguard Inc. v. House of Moxie, Inc., 230 F. Supp. 3d 290, 307 (S.D.N.Y. 2017) (quoting Katz Dochrermann & Epstein, Inc. v. Home Box Office, No. 97 Civ. 7763, 1999 WL 179603, at *4 (S.D.N.Y. Mar. 31, 1999)); see also PLC Trenching Co., LLC v. Newton, No. 6:11-CV-0515, 2011 WL 13135653, at *10 (N.D.N.Y. Dec. 12, 2011) ("To state an unfair competition claim on a theory of misappropriation under New York common law, a plaintiff must allege that the defendant (1) misappropriated and used, (2) the plaintiff's property [or commercial advantage], (3) to compete against the plaintiff's own use of the same property [or commercial advantage]." (internal citations omitted))

Plaintiff has framed its unfair competition claim in terms of misappropriation of trade secrets, alleging that the OLR Customer List, CMS Data Rentals/Sales spreadsheets, and Buyers List that Meis emailed to her personal email account constitute trade secrets under New York law. (See Pltf. Br. (Dkt. No. 11) at 19; Pltf. Supp. Reply Br. (Dkt. No. 43) at 8-9).

Where a plaintiff contends that a defendant misappropriated a trade secret or some other form of proprietary, confidential information, a plaintiff seeking a preliminary injunction must "'put forth sufficient evidentiary proof to show what specific data the individual defendants misappropriated.'" Paz Sys., Inc. v. Dakota Grp. Corp., No. Civ. 054763 (LDW) (WDW), 2006 WL 8430241, at *6 (E.D.N.Y. June 16, 2006) (quoting Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc., 154 F. Supp. 2d 586, 607 (S.D.N.Y. 2001); see also Tactica, 154 F. Supp. 2d at 607 (denying preliminary injunction where plaintiff "failed to make the requisite evidentiary

showing" that defendants used plaintiff's proprietary information); Hancock v. Essential Res.,

Inc., 792 F. Supp. 924, 927 (S.D.N.Y. 1992) (denying preliminary injunction premised on unfair

competition claim where – "assuming that the Customer Materials were kept confidential" –

plaintiff had not "establish[ed] the requisite unauthorized taking and exploitation of the

Customer Materials").

        Courts applying New York law have embraced the Restatement of Torts'

definition of a trade secret: "A trade secret may consist of any formula, pattern, device or

compilation of information which is used in one's business, and which gives [the holder] an

opportunity to obtain an advantage over those who do not know or use it." Integrated Cash

Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990) (quoting

Restatement of Torts § 757).

        New York courts consider six factors in determining whether information

constitutes a trade secret:

> (1) the extent to which the information is known outside of [the holder's]
> business; (2) the extent to which it is known by employees and others involved in
> [the holder's] business; (3) the extent of measures taken by [the holder] to guard
> the secrecy of the information; (4) the value of the information to [the holder] and
> to [its] competitors; (5) the amount of effort or money expended by [the holder] in
> developing the information; (6) the ease or difficulty with which the information
> could be properly acquired or duplicated by others.

Id. (citations omitted).

        Plaintiff cites case law in which client lists – under certain circumstances – have

been found to constitute trade secrets under New York law. (See Pltf. Supp. Reply Br. (Dkt. No.

43) at 6-8) For example, "[a] list of clients may qualify as a trade secret if the potential

customers for a particular product or service 'cannot be readily ascertained outside their

business' but only 'through the expenditure of substantial time and money,'" (id. at 6 (quoting

Giffords Oil Co. v. Wild, 106 A.D.2d 610, 611 (2d Dep't 1984)), or if the client list "include[s] 'information relating to clients that is not readily known in the trade and that is discoverable only through effort,'" (id. (quoting Stanley Tulchin Assocs., Inc. v. Vignola, 186 A.D.2d 183, 185 (2d Dep't 1992)). These cases do not support Plaintiff's argument that the spreadsheets at issue here constitute trade secrets, however .

As an initial matter, Plaintiff misrepresents the evidence in asserting that Meis "acknowledged that the materials which she took were proprietary and trade secrets." (Pltf. Supp. Reply Br. (Dkt. No. 43) at 7) To the contrary, Defendants have consistently maintained throughout this litigation that none of the information Meis emailed to herself or shared with Urban Compass is proprietary to Plaintiff. (See Meis Aff. (Dkt. No. 24) ¶ 9; Meis Supp. Aff. (Dkt. No. 46-2) ¶ 2) Indeed, Meis maintains that "to the extent any of the information that I emailed [to] myself is proprietary, I believe it to be proprietary to me." (Meis Aff. (Dkt. No. 23) ¶ 11) As discussed above, Meis also contends that she created the spreadsheets at issue on her own. Plaintiff has offered little evidence that casts doubt on Meis's representations.

With respect to the OLR Customer List, Plaintiff emphasizes that it provided a lead to Meis concerning Jesse Cahill, and that his name appears on that list. (See Pltf. Reply Br. (Dkt. No. 29) at 8-9) There is no other evidence that Plaintiff played any role in the development of the OLR Customer List, however. Moreover, the references included in the "Origin" column in this spreadsheet – which appears to list the source of the customer – indicate that the customer names were self-generated. The Origin column's references to "personal referral," "StreetEasy," "Other Source," and "Facebook" tend to support Meis's explanation that she "placed all serious potential buyer and rental customer leads that [she] procured through [her] Social Media marketing, [or] that [she] individually paid for as 'paid leads' from publicly available resources

19

such as StreetEasy or Zillow, or that [she] procured through [her] sphere of influence, referrals, friends, or acquaintances into the OLR platform in order to send them active listings based on criteria the potential customers and [Meis had] discussed." (Meis Supp. Aff. (Dkt. No. 46-2) ¶ 5)

Although Plaintiff asserts that the information contained in the OLR Customer List "was derived from Plaintiff's OLR company account, and the attachment includes the names and addresses of Plaintiff's customers" (Levaia Supp. Reply Dec. (Dkt. No. 42) ¶ 6), Plaintiff has offered no evidence that the information at issue came from Modern Spaces' "company account" or that anyone but Cahill was a "customer" of Modern Spaces.

In any event, even if Plaintiff could show that the OLR Customer List was compiled from information maintained by Plaintiff, and/or that the individuals listed in the spreadsheet are Modern Spaces customers, such a showing would not be sufficient to demonstrate that the OLR Customer List is a trade secret. Plaintiff has offered no evidence that the OLR Customer list required "the expenditure of substantial time and money" to compile, or that it contained "information relating to clients that is not readily known in the trade and that is discoverable only through effort." Individuals seeking to buy or rent residences widely circulate their names, telephone numbers, and email addresses to real estate brokers. In sum, Plaintiff has not demonstrated that the OLR Customer List is a trade secret.

With respect to the "CMS Data Rentals/Sales" spreadsheets, Plaintiff has offered no evidence in support of its allegation that these spreadsheets reflect "leads [that] were given to Meis by Modern Spaces." (Levaia Supp. Reply Decl. (Dkt. No. 42) ¶ 7) The "entered into CMS" column on these spreadsheets supports Meis's explanation that (1) the purpose of these lists was to help Meis keep track of her deals, and (2) the spreadsheets reflect "the necessary information that [she] was required to enter **into** Modern Spaces' CMS database per Modern

Spaces' request." (Meis Supp. Aff. (Dkt. No. 46-2) ¶ 10) (emphasis in original)  Moreover, five

of the deals listed on the CMS Data Rentals/Sales spreadsheet were still pending when Meis

resigned from Modern Spaces, and information concerning these deals was never entered into

CMS.[11] (Id. ¶¶ 12-13)  In sum, Plaintiff has not demonstrated that the CMD Data Rentals/Sales

spreadsheet constitutes a trade secret.

Finally, as to the "Buyers List" spreadsheet, Plaintiff has not offered any evidence

– other than the fact that the Buyers List includes Jesse Cahill's name – to support its claim that

the Buyers List reflects Modern Spaces' customers and information Modern Spaces gathered

from these customers.  Even assuming arguendo that the names and information were first

gathered by Modern Spaces, there is no evidence that compiling this list took "substantial time

and money," or that this information "is not readily known in the trade and . . . discoverable only

through effort."  As Defendant Meis argues, buyers "presumably reach out to every broker in

town . . . and offer[] these basic facts about their interests freely so that a broker [can] suggest

properties that match[] their interests." (Meis Supp. Aff. (Dkt. No. 46-2) ¶¶ 14-15)  Where the

"'effort invested in developing . . . customers simply involve[s] widespread canvassing,'" courts

typically find that customer lists do not rise to the level of protected trade secrets.  See, e.g., Iron

Mountain Info. Mgmt., Inc. v. Taddeo, 455 F. Supp. 2d 124, 140 (E.D.N.Y. 2006) ("[T]he efforts

to develop the customer contacts largely involved a widespread canvassing on the part of

---

[11] Meis's testimony on this point is corroborated by email communications between Meis and
Modern Spaces's Lisa Ingardia on January 23, 2018 and January 24, 2018, after Meis had
resigned. In these emails, Meis tells Ingardia: "I have 5 pending deals (4 sales and 1 rental) I am
ex[p]e[c]ting to close in the coming weeks/months. I'll provide you with a list of those shortly."
In a later email, Meis supplies Ingardia with details concerning these deals, including the
property addresses, purchase/rental prices, commission percentages, and agent splits. (See Meis
Supp. Aff., Ex. B (Dkt. No. 46-2) at 19)  This evidence supports Meis's claim that the CMS Data
Rentals/Sales spreadsheet reflects information she entered into the CMS system, rather than
information supplied by Plaintiff.

Taddeo. Furthermore, . . . the list of customer contact information was developed largely through the efforts of Taddeo both before and during his employment at Iron Mountain, in a market that is not highly specialized but has many, easily identifiable, potential customers. . . . As to both lists, it would not be too difficult for someone to duplicate the names by again canvassing the market through phone calls and general research. . . . [T]he Court finds that Iron Mountain has failed to demonstrate . . . that the [customer lists] are entitled to trade secret protection."); Consol. Brands, Inc. v. Mondi, 638 F. Supp. 152, 157 (E.D.N.Y. 1986) (same).

Accordingly, the Court concludes that Plaintiff has not demonstrated that the OLR Customer List, CMS Data Rentals/Sales spreadsheets, or Buyers List constitute trade secrets under New York law.

Although Plaintiff has founded its state law unfair competition claim on a theory that Defendants misappropriated Plaintiff's trade secrets, such a claim does not require proof that the information misappropriated constituted a trade secret: "[w]here the information [at issue] 'would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, including detailed customer information by an employee for use in his future business or employment is to be enjoined as unfair competition.'" Amphenol Corp. v. Paul, 993 F. Supp. 2d 100, 112 (D. Conn. 2014), aff'd, 591 F. App'x 34 (2d Cir. 2015) (quoting Ecolab Inc. v. Paolo, 753 F. Supp. 1100, 1111 (E.D.N.Y. 1991); Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minutemen Optical Corp., 135 A.D.2d 889 (3d Dep't 1987)) Accordingly, this Court has considered whether Plaintiff has demonstrated that the OLR Customer List, CMS Data Rentals/Sales spreadsheets, or Buyers List are proprietary and confidential as to Plaintiff, albeit not trade secrets.

.

For the reasons discussed above, Plaintiff has not demonstrated a likelihood of success even under this lesser standard. Plaintiff has not shown that any of these spreadsheets constitute "internal company documents" of which there was an "unauthorized physical taking and exploitation." Amphenol Corp., 993 F. Supp. 2d 100 at 112. Indeed, Plaintiff has not offered evidence demonstrating that it created the spreadsheets at issue, or that it was the source of the information contained therein. Accordingly, Plaintiff has not demonstrated a likelihood of success on the merits or sufficiently serious questions going to the merits of its state law unfair competition claim.

### 2. Defend Trade Secrets Act Claim

Under the Defend Trade Secrets Act, "a party must show 'an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.'" Free Country Ltd v. Drennen, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016) (quoting Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc., No. 15 Civ. 211 (LGS) (RLE), 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016)). The DTSA defines trade secrets as "any business information that, '(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) . . . derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from the disclosure or use of the information.'" Gen. Sec., Inc. v. Commercial Fire & Sec., Inc., No. 17 Civ. 1194 (DRH) (AYS), 2018 WL 3118274, at *4 (E.D.N.Y. June 25, 2018) (quoting 18 U.S.C. § 1839(3)(A)-(B)). "'Improper means' under the Act includes 'theft,

23

bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy,' but excludes 'reverse engineering, independent derivation, or any other lawful means of acquisition.'" AUA Private Equity Partners, LLC v. Soto, No. 17 Civ. 8035 (GHW), 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018) (quoting 18 U.S.C. § 1839(6)).

In its moving papers, Plaintiff merely argues that, "[g]iven the broad definition of 'trade secret,' it is evident that the proprietary information taken by Meis certainly qualifies as trade secrets, including compilation listings and prospective clients. Accordingly, Modern Spaces has established trade secret protection under federal law as well as under state law." (Pltf. Br. (Dkt. No. 11) at 19).

In its supplemental briefing, Plaintiff merely asserts that OLR Customer List, the CMS Data spreadsheets, and the Buyer's List are "certainly 'business' documents which Plaintiff had taken 'reasonable measures to keep . . . secret' and [which] w[ere] not 'readily ascertainable' by another party. Therefore, these documents constitute 'trade secret[s]' under the DTSA as well as under New York law." (Pltf. Supp. Reply Br. (Dkt. No. 43) at 9-10)

Because Plaintiff has offered little evidence that (1) it created the OLR Customer List, CMS Data Sales/Rentals spreadsheets, or Buyers List; or (2) Plaintiff was the source of the information set forth in these spreadsheets, Plaintiff has not shown either that it was the "owner" of the documents or information contained therein, or that any "improper means" were used to acquire the documents or information. Accordingly, Plaintiff has not met its burden of demonstrating a likelihood of success on the merits, or sufficiently serious questions going to the merits, with respect to its DTSA claim.

### 3.      **Breach of Contract Claim**

The Agreement between Modern Spaces and Meis provides for the application of New York law.  (See Meis Supp. Aff., Ex. A (Dkt. No. 46-2) ¶ 11(b)) ("This Agreement shall be construed in accordance with and all disputes relating hereto shall be governed by the laws of the State of New York[.]"))  "Under New York law, the elements of a breach of contract claim are (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages."  Swan Media Grp., Inc. v. Staub, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012) (citing Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 177 (2d Cir. 2004)).

With respect to the first element, it is undisputed that the Agreement contains a non-disclosure provision, which provides that "any information to which [Meis] ha[s] access at MODERN SPACES and/or which is related to the business of MODERN SPACES whether printed, written or computerized, including without limitation, open listings, exclusive listings, co-exclusive listings, co-brokers listings, names, addresses and telephone numbers pertaining to or in connection with any such listings, is deemed confidential and proprietary to MODERN SPACES (the 'Proprietary Information')."  (Meis Supp. Aff., Ex. A (Dkt. No. 46-2) ¶ 10(a)) When Meis's association with Modern Spaces ended, she would be obligated  to turn over "all written materials . . . concerning the Proprietary Information," and "not to use or disclose to others any proprietary information without the written permission of MODERN SPACES."  (Id.)

Meis argues that the Agreement's non-disclosure provision is impermissibly overbroad, noting that it purports to prevent her from using publicly available information, such as listing information, that the rest of the world can use.  (Defs. Br. (Dkt. No. 19) at 25)  As a

result, Meis contends that the non-disclosure provision is an unenforceable and unlawful restraint on competition. (Id. at 25-26)

"Restrictive covenants, such as . . . confidentiality agreements [], are subject to specific enforcement to the extent that they are '"reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." '" Ashland Mgmt. Inc. v. Altair Investments NA, LLC, 59 A.D.3d 97, 102 (1st Dept. 2008) (quoting BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 389 (1999)), aff'd as modified, 14 N.Y.3d 774 (2010). "With respect to covenants aimed at protecting against misappropriation of an employer's trade secrets or confidential customer lists, 'courts . . . recognize the legitimate interest an employer has in safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial piracy. Thus, restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information.'" Id. (quoting Reed, Roberts Assocs., Inc. v. Strauman, 40 N.Y.2d 303, 308 (1976)); Stanley Tulchin Assocs., Inc. v. Vignola, 186 A.D.2d 183, 185-86 (2nd Dept. 1992) (finding restrictive covenant overbroad, and enforcing it only as to plaintiff's client lists, which "contain[ed] information relating to clients that is not readily known in the trade and that is discoverable only through effort").

Here, the Agreement's non-disclosure provision is unreasonable in time and area, is not necessary to protect Plaintiff's legitimate interests, and is unreasonably burdensome to the employee. The Agreement is impermissibly overbroad in that it seeks to restrain Meis from disclosing "any information to which [she] ha[d] access at MODERN SPACES and/or which is related to the business of MODERN SPACES," regardless of whether that material constitutes a trade secret or is otherwise proprietary and confidential. (See Meis Supp. Aff., Ex. A (Dkt. No.

46-2) ¶ 10(a)); see also Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 42 N.Y.2d 496, 498-99 (1977) (finding nondisclosure provision preventing employee from disclosing "to any person, firm or corporation, the name, address or requirements of any customer or prospective customer of the Company and . . . any other information that he has or shall have acquired during his period of employment, insofar as the same is or may be necessary to protect the Company's business" to be overbroad, because "its broad-sweeping language is unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness").

Even if enforcement of the Agreement's non-disclosure provision were limited to trade secret and other proprietary and confidential information, Plaintiff could not demonstrate a breach because – as discussed above – Plaintiff has not demonstrated that any of the information Meis emailed to herself constitutes a trade secret or other proprietary and confidential information. Accordingly, Plaintiff has not demonstrated a likelihood of success on the merits or sufficiently serious questions going to the merits with respect to its breach of contract claim, and its request for a preliminary injunction will be denied.

## CONCLUSION

For the reasons stated above, Plaintiff's application for a preliminary injunction is

denied.[12] The Clerk of Court will terminate the motion (Dkt. No. 10).

Dated:  New York, New York
        January 16, 2019

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[12] Defendants' application for an award of attorneys' fees and costs (see Kirsch Supp. Decl. (Dkt. No. 46-3) ¶ 13) is likewise denied.